UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NICOLE HARRIS, Personal
Representative of the
estate of Jkhary Craft, deceased,

        Plaintiff,

vs.

OFFICER EDWARD LASSEIGNE,
et al,

        Defendants.
_____/

Case No. 12-CV-13763

HON. GEORGE CARAM STEEH

**OPINION AND ORDER GRANTING EMERGENCY MANAGER
DEFENDANTS MOTION FOR SUMMARY JUDGMENT (DOC. # 22),
DENYING AS MOOT DEFENDANTS' MOTION FOR LEAVE TO FILE
AMENDED AFFIRMATIVE DEFENSES (DOC. # 21), AND GRANTING
IN PART AND DENYING IN PART DEFENDANTS LASSEIGNE, MILLER
AND CITY OF PONTIAC'S MOTION FOR SUMMARY JUDGMENT (DOC. # 40)**

**INTRODUCTION**

      This is a case in which plaintiff Nicole Harris, as Personal Representative ("PR") for the estate of her son, Jkhary Craft, brought 42 U.S.C. §1983 claims and state law claims against two Pontiac police officers, the City of Pontiac, and the former and current Emergency Managers for the City of Pontiac. The claims arise from the fatal shooting of plaintiff's son, then age 14, by defendant Pontiac police officer Edward Lasseigne. Before the court are two motions for summary judgment. One is brought by the two Emergency Manager defendants, and the other is brought by the defendant

-1-

officers and the City of Pontiac. Defendants have also requested leave to file amended affirmative responses. The court's determinations on the motions is set forth below.

## BACKGROUND

The beginning of the interaction between Jkhary Craft ("Craft") and the officers is not disputed by the parties. On August 27, 2009, a 911 call came in to the City of Pontiac, describing males with guns. Defendant officers Lasseigne and Miller were riding together that day in a marked police Chevy Tahoe with Miller driving. Two other officers, Werner and Daves, were partners in a different police Tahoe. After dispatch contacted the officers to tell them the "subjects with guns were now walking west on Ypsilanti," Lasseigne and Miller encountered Craft walking down that street. The other Tahoe with Werner and Daves approached from the opposite direction. Officers described Craft "tugging at his waistband," and Lasseigne testified that he saw a long bulge extending from Craft's shirt into his pants. After Werner motioned to Craft to come over to him, Craft pulled a sawed-off shotgun out of his clothes and began to run.

Craft ran in between two houses on Ypsilanti and into an open field behind the houses, followed by the Miller/Lasseigne Tahoe. Werner and Daves were also on the scene on foot. The officers have all described Lasseigne repeatedly yelling to Craft to "drop the gun." Craft continued running in the direction of a wooded area. Miller maneuvered the Tahoe along a privacy fence separating the backyard of a house from the woods in an attempt to block Craft. Officers describe that the front quarter panel on the passenger side of the Tahoe came into contact with Craft in this process.

The parties dispute the sequence of events that followed. At least three officers describe Craft, trapped between the privacy fence and the vehicle, as having the gun in his hands at the time he was shot by Lasseigne. Lasseigne testified that Craft pointed the barrel of the weapon at both Lasseigne and Miller, who were approximately 3 or 4 feet away from Craft. Lasseigne states that then, fearing for his life and the life of his partner, he fired one shot at Craft, who was hit in the chest by the bullet. Werner and Daves have testified that after Craft was shot, they saw him throw his sawed-off shotgun over the privacy fence next to him and into the back yard of 127 Ypsilanti. Plaintiff questions how Craft, under these circumstances, could have thrown a weapon over a privacy fence, and offers the affidavit of a neighbor, Karl Harris (who lives or lived in the house next to the one located at 127 Ypsilanti), who attested that he looked out of his doorwall toward the police activity right after he heard the gunshot that hit Craft. He attested that he did not see a gun coming over the fence. The parties argue about this testimony, with defendants asserting that the affidavit information is not entirely consistent with Harris's deposition testimony, and that Harris may not have been facing the window of the doorwall at the moment the shot was fired.[1]

The officers further describe Craft, following the shot, as saying "ow, you shot me," pulling his t-shirt away from his body and looking down. He slowly slumped over,

---

[1]Defendants also criticize plaintiff's proffer of an affidavit by law enforcement consultant Ken Katsaris, which examines the blood found on the vehicle and the fence and suggests that blood would have also been on the weapon if the weapon had been in Craft's hands when he was shot.

and when Miller backed the vehicle up, Craft fell to the ground. An emergency response team was called to the scene but pronounced Craft dead upon their arrival.[2]

Officers found the unloaded sawed-off shotgun on the other side of the privacy fence, in the back yard of 127 Ypsilanti. This is also where Lasseigne's shell casing was found.

Craft's mother, plaintiff Nicole Harris, was appointed PR of Craft's estate on February 2, 2010. On May 16, 2012, the probate court issued "Notice of Intent to Close Estate and Terminate PR's Authority," stating

> The Personal Representative has failed to file a Notice with the Court that the Estate remains under administration ...The court will close the administration of this Estate and terminate the Personal Representative's authority within 63 days of this Notice, unless...[t]he PR files any of the following...

(Ex. V-pp. 12). On June 13, Harris's counsel Howard Linden petitioned the court to withdraw, stating that he "attempted to have the PR sign a Sworn Statement to Close Unsupervised Administration on several occasions and the client has either refused or neglected to sign the document..." Id. at 6-7. Linden was permitted to withdraw after a hearing held July 18, 2012. On July 24, 2012, the probate court issued a Memo of Administrative Closing to Harris. The instant wrongful death lawsuit was filed on August 24, 2012, one month after the estate had been closed and Harris's authority terminated.

Before the court are several motions. Defendants have filed two motions for summary judgment. One summary judgment motion was filed by the Emergency

---

[2] Although defendants point out that the toxicology report revealed cannabinoids in Craft's system at the time of his death, and that a shotgun shell was found in Craft's pocket, neither fact impacts this decision.

-4-

Manager defendants, and the other by the officers and City of Pontiac. Defendants have also requested to file amended affirmative defenses. Oral argument was held on November 14, 2013, at which the court stated its rulings and noted that a written opinion would follow.

## STANDARD

Federal Rule of Civil Procedure 56(a) empowers the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Williamson v. Recovery Ltd. Partnership, 731 F.3d 608, 624 (6th Cir. 2013). If the movant establishes by use of the material specified in Rule 56(c)(1) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will only a scintilla of evidence supporting the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248. Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

## DISCUSSION

**I.  City of Pontiac and Emergency Manager Defendants**

In the motion for summary judgment filed by the officers and the City of Pontiac, the City of Pontiac argued that it was entitled to judgment under Monell v. Dep't of

Social Services, 436 U.S. 658, 695 (1978) for the reason that plaintiff had not identified any unconstitutional customs, policies, or procedures of the City. The motion as to this defendant was not opposed by plaintiff. Likewise, as discussed on the record at the outset of oral argument, plaintiff did not take issue with the Emergency Manager defendants' arguments that they were not involved in any way in the incident underlying this lawsuit and were also entitled to judgment in their favor. As discussed on the record, plaintiff does not oppose entry of judgment for the City of Pontiac and the Emergency Manager defendants as to all claims, federal and state. The court will thus dismiss all pending claims against these defendants, and will also deny as moot the defendants' motion for leave to amend their affirmative defenses, which addresses only potential liability of the Emergency Manager defendants.

## II. Plaintiff's Authority to File Suit

Both briefs on summary judgment include the threshold argument that when plaintiff commenced this action on August 24, 2012, her authority as PR had been terminated by the probate court and the decedent's estate had been closed. Therefore, they assert entitlement to summary judgment for the reason that plaintiff lacked the authority to file this lawsuit.[3]

---

[3] Alternatively, defendants contend that under Mich. Comp. Laws Ann. § 600.5852(1), plaintiff filed this lawsuit after the statute of limitations passed. § 600.5852 provides:
>    (1) If a person dies before the period of limitations has run or within 30 days after the period of limitations has run, an action that survives by law may be commenced by the personal representative of the deceased person at any time within 2 years after letters of authority are issued although the period of limitations has run.

The statute thus allows for the filing of an action after said period has run. Defendants' reliance on § 600.5852(1) is misplaced, however, because plaintiff filed this action within

Defendants argue there was no authority to sue on behalf of the estate because plaintiff's authority as PR of the estate had been terminated, and the estate itself was closed July 24, 2012. (Doc 35-1 at 2). Plaintiff argues, however, that because she was re-appointed PR of the estate on August 1, 2013, and because she reasonably believed she was acting under the proper authority at the time she filed this complaint, her re-appointment, although past the statute of limitations, should relate back to the date of the complaint.

Plaintiff was appointed PR of her son's estate on February 2, 2010 by the Oakland County Probate Court ("OCPC"). In the event that an estate is not settled within 1 year after the initial PR appointment, MCL 700.3951(3) requires that the PR "file with the court and send to each interested person a notice that the estate remains under administration, specifying the reasons for the continued administration." Plaintiff's probate counsel, Howard Linden, did file such a notice on February 2, 2011, indicating that a cause of action was under investigation, but neither plaintiff nor Mr. Linden filed any subsequent notices of continued administration.

On May 16, 2012, the OCPC mailed plaintiff, decedent's father and Mr. Linden a notice of intent to close the estate and terminate plaintiff's authority as PR. This notice was mailed to plaintiff at 38 Strathmore, Pontiac, Michigan, which she claims was not her current address, and she states she did not receive the notice. Mr. Linden filed a

---

the period of limitations. The statute of limitations for § 1983 claims is 3 years. Otworth v. Vanderploeg, 61 F. App'x 163, 165 (6th Cir. 2003) (citing Mich. Comp. Laws § 600.5805(8) and Carroll v. Wilkerson, 782 F.2d 44, 45 (6th Cir. 1986)). The incident occurred on August 27, 2009, and plaintiff commenced this lawsuit on August 24, 2012. Thus, § 600.5852 does not govern the situation at hand.

petition to withdraw on June 13, 2012, citing a breakdown in communication which compromised the attorney-client relationship. Mr. Linden pointed to plaintiff's "refus[al] or neglect" to sign a "Sworn Statement to Close Unsupervised Administration." (Doc. 35-1 at 7).

On July 9, 2012, Mr. Linden mailed, and plaintiff agrees she received, a notice of hearing on his petition to withdraw. This letter was mailed to plaintiff's address at 574 Labaron, Pontiac, Michigan. The notice only indicated that Mr. Linden intended to withdraw as counsel and did not include any information regarding the closing of the estate or termination of plaintiff's authority as PR. The record is devoid of any indication that plaintiff attended the hearing.

On July 18, 2012, the OCPC granted Mr. Linden's petition to withdraw, and on July 24, 2012, the probate court mailed plaintiff notice, again to the Strathmore address, that the estate was closed and her authority as PR had been terminated. Plaintiff claims she did not receive this notice. Plaintiff was re-appointed PR of decedent's estate on August 1, 2013, after defendant EMs raised the argument that she lacked the authority to sue. (Doc. 36-1 at 2).

While the relation-back doctrine has long been accepted under Michigan law, the scope of its application has evolved over time. There are several cases, not unlike plaintiff's, which involve PRs who filed suit at a time when they did not legally have the authority to do so. In <u>Fisher v. Volkswagenwerk Aktiengesellschaft</u>, 321 N.W.2d 814 (1982), the court "pulled back from the trend of liberal application of the relation-back doctrine." <u>Saltmarsh v. Burnard</u>, 151 Mich.App. 476, 487 (1986). In that decision, the

court held that the plaintiffs' misrepresentation of their capacity to sue under the wrongful death act at the time the suit was filed, and subsequent reopening of the decedent's estate after the period of limitations had expired, did not relate back to the filing of the lawsuit and therefore, the suit was barred. Fisher, 321 N.W.2d at 816. The court reasoned that "the reopening of an estate is not merely a formality, technicality or ministerial function in the probate court." Id.

Defendants rely on the holding in Fisher to support their argument without mentioning the Sixth Circuit's later interpretation in Wieczorek v. Volkswagenwerk, A.G., 731 F.2d 309 (1984). In that case, decedent's father filed a claim against the vehicle manufacturer, alleging the car was defective and negligently designed and manufactured. Id. at 310. Decedent's estate was open and closed on the same day, with decedent's mother as PR, prior to the filing of the lawsuit; the estate was not reopened until after plaintiff commenced the action. Id. The Court reconciled the narrow Fisher holding with prior Michigan court decisions and stated the test which has been used ever since. It held, "an appointment as administrator after the statute of limitations has expired relates back to the filing of a wrongful death suit if at the time the suit was filed the plaintiff reasonably believed he had authority to bring suit as administrator." Id. at 312.

In Saltmarsh, for example, the court found a question of material fact surrounding plaintiff's reasonable belief when the plaintiff claimed there was a mix-up between her former and current counsel as to who would confirm plaintiff held the proper authority to file suit. Saltmarsh, 391 at 388. In its reasoning, the court stated, "[i]t may well be that

plaintiff had reasonable grounds, such as the estate attorney's failure to inform her that the estate was closed and she was thereby discharged as personal representative, or her current attorney's assurances of her status as personal representative, leading her to believe that she was a duly appointed personal representative having authority to bring the legal malpractice suit." Id. at 389. In reaching this conclusion, the court noted that "the focus in applying the relation-back doctrine is not on the attorney's knowledge or belief, but on the *plaintiff's* reasonable belief." Id. (emphasis added).

Plaintiff convincingly argues she reasonably believed her complaint was filed with the authority to do so. First, plaintiff points to the lack of an expiration date on her Letters of Authority appointing her as PR. (Doc. 36-3 at 6). Although Letters of Authority only serve the purpose of appointing a PR, plaintiff implicitly argues she was unaware that her authority could terminate. Next, plaintiff claims she did not receive any notifications from the OCPC because they were mailed to a prior address. She maintains that even though she "never spoke to Howard Linden personally," he did in fact have her correct address, as demonstrated by his July 9, 2012 letter to plaintiff mailed to her 574 Labaron address. Thus, plaintiff implies, the probate court should have had her current address on file via Mr. Linden. In her pleadings, plaintiff did not indicate on what date she changed her address.

Plaintiff also highlights Mr. Linden's petition to withdraw, specifically that she "refused" to sign the "Sworn Statement to Close Unsupervised Administration." She argues that her refusal signifies she intended to continue acting as PR of the estate and

reasonably believed her status as PR was unchanged at the time she filed suit. It is unclear, however, whether plaintiff's missing signature was a result of refusal or neglect.

Lastly, plaintiff asserts it was reasonable to believe the estate was still open even though Mr. Linden sent a letter regarding his intention to withdraw because his letter was sent four months after the required annual notice of continued administration was due and referenced a pending hearing in the matter of the estate.

When viewing the evidence in the light most favorable to plaintiff, the court finds there is a question of material fact as to whether plaintiff reasonably believed she had the authority to file suit as administrator of decedent's estate. Accordingly, the court will not grant the motion on this basis.

### III. City of Pontiac and Officers Lasseigne and Miller

### (a) Claims under §1983

The motion for summary judgment filed by the officers and the City of Pontiac first argues that the officers did not use excessive force in contacting Craft with the police vehicle (Officer Miller) or shooting Craft in the chest (Officer Lasseigne). Next, they argue that even if there is a genuine issue regarding whether the force was excessive, they are entitled to qualified immunity.

Where the defense of qualified immunity applies to § 1983 claims brought against police officer defendants, it is a bar to suit. It therefore should be resolved at the "earliest possible stage in litigation." Rondigo, L.L.C. v. Twp. of Richmond, 641 F.3d 673, 681 (6th Cir. 2011) (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)(internal citation omitted). A court's determination on this issue requires a two step analysis.

The court first considers whether, viewing the facts in the light most favorable to the plaintiff, the officer violated a constitutional right? Saucier v. Katz, 533 U.S. 194, 201 (2001). If the answer to the first question is yes, the court then must consider whether the right was clearly established. See Grawey v. Drury, 567 F.3d 302, 313 (6th Cir. 2009).

A decision on these arguments requires an examination of the evidence. The defendants argue that neither the maneuvering of the vehicle nor the shot into Craft's chest represented excessive force under the circumstances. Defendants assert that in order to prevent Craft from getting into the woods with a sawed-off shotgun, Miller blocked his path with the vehicle, coming into contact with Craft. Then, instead of dropping the gun, the defendants assert, Craft raised it directly at Miller and Lasseigne. They argue that neither the neighbor's (Mr. Harris) affidavit nor the plaintiff's report raises an issue of material fact, because what was not seen does not create an issue of fact for the jury, citing Chappell v. Cleveland, 585 F.3d 901 (6th Cir. 2009).

Defendants argue there "is no question that the officers were justified in their belief that Craft was armed, dangerous and presented an immediate risk not only to their safety, but to the safety of the general public." (Defendants' Brf. At 17.) Furthermore, defendants assert that

> [e]ven if Lasseigne was somehow mistaken and Craft had dropped or thrown the weapon just moments before Lasseigne's shot, this mistake was honest, and reasonable under the circumstances and, as the Simmonds court instructs, no excessive force claim exists.

As noted, defendants rely on the case of Simmonds v. Genesee County, 682 F.3d 438 (6th Cir. 2012) for this argument, and also cite to an Eastern District case of May v. Bloomfield Twp., 2013 WL 2319323 at *7 (E.D. Mich., May 28, 2013).

If the court finds that the defendants' actions, viewed in the light most favorable to plaintiff, did constitute excessive force, defendants argue that the officers are nonetheless entitled to qualified immunity for their actions.  This immunity exists whether or not defendants were mistaken about the force necessary to subdue Craft, they say, because the belief that Craft posed a danger to them or the public was reasonable.  Pointing to the landmark case of Anderson v. Creighton, 438 U.S. 635, 641 (1987), defendants question whether "in light of all the information possessed by the officers at the time force was used," could a reasonable officer have believed that the force employed by Lasseigne was lawful.  Where the plaintiff was reasonably believed to be an imminent safety threat, defendants assert he had no clearly established constitutional right to be free from deadly force.

First, concerning Officer Miller, the court finds no question of material fact as to whether his actions constituted excessive force.  Miller's testimony is consistent with the video, i.e., that he was using the car to block Craft's escape, rather than to injure Craft.  The lack of evidence of any significant injury aside from the gunshot wound (the court acknowledges plaintiff's suggestion that bruising may have been overlooked, but there is no indication in the record that Craft sustained any significant injury through impact with the vehicle) is also consistent with a lack of excessive force.  Accordingly, Officer Miller is entitled to summary judgment.

However, concerning Officer Lasseigne, an examination of the facts in the light most favorable to plaintiff leads the court to come to the opposite conclusion. As discussed at oral argument, in the court's view the issue probably boils down to whether the gun held by Craft went over the fence before or after he was shot by Officer Lasseigne. While the court acknowledges that the probative value of the neighbor's testimony is likely limited, it is the court's determination that this should be considered by the jury. In addition, plaintiff points to the fact that Craft was shot only once, which she posits as inconsistent with officer training protocol and common sense, both of which would call for multiple shots in the face of imminent danger. Plaintiff also highlights still shots from the police video which depict Craft pinned–at least to some extent–to the fence. This brings into question Craft's ability to move, or "swing" a weapon during the events in question. Plaintiff also relies on the undisputed fact that the weapon did not have any blood on it, while both the fence and vehicle were splattered with blood, as evidence that Craft was not holding and pointing the gun at the officers when he was shot. Finally, the testimony of the officers reveals great uncertainty about the handling of Craft's gun, and at what point it went over the fence.

While this is a close case, it is the court's determination that this evidence, considered in a light most favorable to Craft, *could* lead to a factfinder's conclusion that he threw the gun over the fence before he was shot. Using deadly force against an unarmed and otherwise non-dangerous suspect is prohibited by the Fourth Amendment. Sample v. Bailey, 409 F.3d 689, 696 (6th Cir. 2005) (citing Tennessee v. Garner, 471 U.S. 1, 11 (1985)). Whether or not this court's view of the facts would entitle the officer to judgment is not the question here, rather, it will be up to the jury to determine the

sequence of events, interpret the evidence, and assess the accuracy and credibility of the various witnesses' testimony about what happened. Because the court finds that genuine questions of material fact exist in determining the reasonableness of Officer Lasseigne's actions under the circumstances presented here, the court has denied the motion for summary judgment as to this defendant on the § 1983 claim.

**(b) State law claims**

Defendants Lasseigne and Miller make similar arguments concerning the state law claims of assault and battery and governmental immunity under state law. Concerning the governmental immunity, defendants assert that there is absolutely no evidence that the actions of the officers were not taken in good faith, and thus immunity bars the claims under state law, citing Odom v. Wayne County, 482 Mich. 459 (2008) (government employee is immune from liability for intentional tort where (a) undertaking of the act was in the course of employment and the employee reasonably believed he was acting within the scope of his authority; (b) the acts were taken in good faith; and (c) the acts were discretionary). Id. at 480-81. As stated in Odom, "there is no immunity when the governmental employee acts *maliciously* or with a *wanton or reckless disregard of the rights of another*." Id. at 474 (emphasis in original) (citation omitted). For the reasons discussed above, the court finds that there is a material question of fact as to this claim as well regarding Officer Lasseigne, but that Officer Miller is entitled to judgment.

**CONCLUSION**

For the reasons given above, the court will enter summary judgment as to all claims in this matter brought against the Emergency Manager defendants, the City of Pontiac, and Officer Miller, but declines to enter summary judgment as to the claims against Officer Lasseigne. Accordingly, the Emergency Manager defendants' Motion for Summary Judgment (Doc. # 22) is **GRANTED**; defendants' Motion for Leave to File Amended Affirmative Defenses (Doc. # 21) is **DENIED AS MOOT**; and defendants Lasseigne, Miller, and the City of Pontiac's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED**.

Dated: December 12, 2013

                                                    s/George Caram Steeh
                                                    GEORGE CARAM STEEH
                                                    UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on December 12, 2013, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk